146 T.C. No. 11

UNITED STATES TAX COURT

ESTATE OF CLARA M. MORRISSETTE, DECEASED, KENNETH MORRISSETTE, DONALD J. MORRISSETTE, AND ARTHUR E. MORRISSETTE, PERSONAL REPRESENTATIVES, Petitioners <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4415-14.                    Filed April 13, 2016.

In 2006 D's revocable trust, T, entered into two split-dollar life insurance arrangements with three distinct trusts. T then contributed a total of $29.9 million to the trusts in order to fund the purchase of life insurance policies on each of D's three sons. The split-dollar life insurance arrangements provided that T would receive the greater of the cash surrender value of the respective policy or the aggregate premium payments on that policy upon termination of the split-dollar life insurance arrangement or the death of the insured.

R determined that the $29.9 million contribution was a gift for tax year 2006. R determined a gift tax deficiency against E, the estate of D, of $13,800,179 and an I.R.C. sec. 6662 penalty of $2,760,036. E moved for partial summary judgment under Rule 121 on the narrow issue of whether the split-dollar life insurance arrangements are governed by the economic benefit regime under sec. 1.61-22, Income Tax Regs.

 Held:  Because the only economic benefit conferred upon the trusts was current life insurance protection, the economic benefit regime applies.

James Egbert McNair III and Kelley C. Miller, for petitioners.

Warren P. Simonsen and Rachel L. Rollins, for respondent.

OPINION

GOEKE, Judge:  This matter is before us on a motion for partial summary judgment under Rule 121(a)[1] filed by the Estate of Clara M. Morrissette (estate). The issue for decision is whether, for valuation purposes, the split-dollar life insurance arrangements at issue are governed by the economic benefit regime set forth in section 1.61-22, Income Tax Regs.[2]

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]We are not deciding whether the estate's valuation of the receivables (the portion of the cash value of each policy the CMM Trust was entitled to receive) in the gross estate is correct.

Decedent, Clara M. Morrissette, lived in Virginia at the time of her death on September 25, 2009. Personal representatives of the estate lived in Virginia when the petition was filed.

## Background

Mrs. Morrissette and her late husband, Arthur E. Morrissette, were married in 1933. Mr. Morrissette and Mrs. Morrissette had three children, Arthur E. Morrissette, Jr. (Arthur), Donald J Morrissette (Donald), and Kenneth Morrissette (Kenneth) (collectively, Morrissette brothers).

In 1943 Mr. Morrissette started a moving company called Ace Van & Storage in Washington, D.C. From 1954 until 2002 the Morrissette family incorporated or purchased a total of 10 companies in addition to Ace Van & Storage (collectively, Interstate Group). All companies in the Interstate Group were brother-sister corporations with identical ownership.

Effective January 1, 2009, all shareholders of each company in the Interstate Group contributed their stock in those companies to Interstate Group Holdings, Inc. (IGH), in exchange for IGH stock. After the exchange IGH remained an S corporation while the remaining Interstate Group companies became qualified subchapter S subsidiaries of IGH.

## Buy-Sell Arrangement

Mrs. Morrissette established a revocable trust, the Clara M. Morrissette Trust (CMM Trust), on August 24, 1994, appointed herself as the initial trustee, and contributed all of her stock in each company in the Interstate Group to the CMM Trust. In September 2006 the Morrissette brothers became successor cotrustees of the CMM Trust to assist Mrs. Morrissette, who at that time had attained 93 years of age and who required assistance in managing her financial affairs.

Arthur, Donald, and Kenneth petitioned the Circuit Court of Fairfax County, Virginia (Fairfax court) for appointment of a conservator for Mrs. Morrissette's estate and asked the conservator to transfer additional assets to the CMM Trust. On August 18, 2006, the court found Mrs. Morrissette to be permanently incapacitated and appointed Cathleen A. Hatfield, an employee of the Interstate Group, to serve as the conservator. The Fairfax court granted Ms. Hatfield broad authority to act on Mrs. Morrissette's behalf. The conservatorship expired on October 20, 2006.

Mrs. Morrissette, through Ms. Hatfield, established three perpetual trusts in 2006: (i) the Arthur E. Morrissette, Jr. Dynasty Trust for the benefit of Arthur and his family (Arthur Dynasty Trust), (ii) the Kenneth Morrissette Dynasty Trust for

the benefit of Kenneth and his family (Kenneth Dynasty Trust), and (iii) the Donald J. Morrissette Dynasty Trust for the benefit of Donald and his family (Donald Dynasty Trust) (collectively, Dynasty Trusts).

On September 19, 2006, the CMM Trust was amended (2006 amendment) to permit the trustee to "(i) pay premiums on life insurance policies acquired to fund the buy-sell provisions of the * * * [Interstate Group's] business succession plan, and (ii) make loans, enter into split-dollar life insurance agreements or make other arrangements".  Additionally, the 2006 Amendment authorized the trustee to transfer each receivable from the split-dollar life insurance arrangement when paid by each Dynasty Trust back to the Dynasty Trust owing the receivable or directly back to each son.

On September 21, 2006, the Dynasty Trusts, the Morrissette brothers, the CMM Trust, and all other trusts holding an interest in the Interstate Group entered into a shareholders agreement.  The shareholders agreement provided that upon the death of Arthur, Donald, or Kenneth, his surviving siblings and their respective Dynasty Trusts would purchase the Interstate Group stock held by or for the benefit of the deceased sibling.[3]

---

[3]For example, if Arthur were the first to die, the Donald Dynasty Trust and the Kenneth Dynasty Trust would purchase equal amounts of all of the stock held

(continued...)

To provide the Dynasty Trusts with the resources to purchase the Interstate Group stock held by or on behalf of a decedent, each Dynasty Trust purchased two universal life insurance policies, one on the life of each other brother. On October 4, 2006, (i) the Arthur Dynasty Trust purchased two universal life insurance policies, one on the life of Donald and one on the life of Kenneth; (ii) the Donald Dynasty Trust purchased two universal life insurance policies, one on the life of Arthur and one on the life of Kenneth; and (iii) the Kenneth Dynasty Trust purchased two universal life insurance policies, one on the life of Arthur and one on the life of Donald (each a policy, and collectively, policies).

Split-Dollar Life Insurance Arrangements

To fund the purchase of the policies, each Dynasty Trust and the CMM Trust entered into two split-dollar life insurance arrangements (each a split-dollar life insurance arrangement, and collectively, split-dollar life insurance arrangements) on October 31, 2006, to set forth the rights of the respective parties with respect to the policies. The CMM Trust contributed (i) $9.96 million to the Arthur Dynasty Trust, (ii) $9.98 million to the Donald Dynasty Trust, and (iii) $9.96 million to the Kenneth Dynasty Trust. The Dynasty Trusts then used that

---

[3](...continued)
directly or indirectly by Arthur.

money to pay a lump-sum premium on each policy to maintain that policy for the insured's projected life expectancy.

Under the split-dollar life insurance arrangements, upon the death of the insured the CMM Trust would receive a portion of the death benefit from the respective policy insuring the life of the deceased equal to the greater of (i) the cash surrender value (CSV) of that policy, or (ii) the aggregate premium payments on that policy (each a receivable, and collectively, receivables). Each Dynasty Trust would receive the balance of the death benefit under the policy it owns on the life of the deceased, which would be available to fund the purchase of the stock owned by or for the benefit of the deceased. If a split-dollar life insurance arrangement terminates for any reason during the lifetime of the insured, the CMM Trust would have the unqualified right to receive the greater of (i) the total amount of the premiums paid or (ii) the CSV of the policy, and the Dynasty Trust would not receive anything from the policy.

Each split-dollar life insurance arrangement includes the following recital: "WHEREAS, the parties intend that this Agreement be taxed under the economic benefit regime of the Split-Dollar Final Regulations, and that the only economic benefit provided to the [Dynasty] Trust[s] under this arrangement is current life insurance protection."

Additionally, the Dynasty Trusts executed collateral assignments of the policies to the CMM Trust to secure payment of the amounts owed to the CMM Trust. Neither the Dynasty Trusts nor the CMM Trust retained the right to borrow against a policy.

Insurance Policies

The life insurance policies acquired by the Dynasty Trusts were universal life insurance policies, a form of permanent life insurance providing the owner with flexibility in making premium payments. Under the policies, the owner may pay premiums in a lump-sum, over a limited number of years, over an extended number of years, or over the life of the insured. The owner can determine the amount of premiums she prefers to pay at the inception of the contract and may change the amount she pays in the future from time to time. Additionally, the owner may stop paying premiums if she experiences financial difficulties or for any other reason and may resume paying premiums at a later date if desired.

The Arthur Dynasty Trust used the $9.96 million it received from the CMM Trust to pay a $4.99 million lump-sum premium payment on the life of Kenneth and used the remaining $4.97 million to pay a lump-sum premium payment on the life of Donald. The Kenneth Dynasty Trust likewise paid a $4.99 million lump-sum premium payment on the life of Arthur and a $4.97 million lump-sum

premium payment on the life of Donald. The Donald Dynasty Trust paid two lump-sum premium payments of $4.99 million, one on the life of Arthur and the other on the life of Kenneth.

Tax Reporting

From 2006 to 2009 Mrs. Morrissette reported gifts to the Dynasty Trusts as determined using the economic benefit regime set forth under section 1.61-22, Income Tax Regs. The amount of each gift reported was the cost of the current life insurance protection as determined using Table 2001[4] issued by the Internal Revenue Service (IRS), less the amount of each premium paid by the respective Dynasty Trust. Mrs. Morrissette reported the following gifts:

| Year | Gross economic benefit | Premiums paid by Dynasty Trusts | Net economic benefit reported as gifts |
|------|------------------------|---------------------------------|-----------------------------------------|
| 2006 | $64,249 | --- | $64,249 |
| 2007 | 430,542 | $256,127 | 174,415 |
| 2008 | 461,406 | 269,832 | 191,574 |
| 2009 | 487,329 | 280,910 | 206,419 |

[4]Table 2001 is a premium rate table taxpayers may use to determine the value of current life insurance protection on a single life provided under a split-dollar life insurance arrangement.

After Mrs. Morrissette passed away, the estate retained Valuation Services, Inc. (VSI), to value the receivables includible in the gross estate as of the date of her death (valuation date). On October 5, 2010, VSI issued its opinion as to the value of the receivables as of the valuation date. VSI also issued supplemental reports dated October 5, 2010, for values as of October 30, 2009. The estate relied on VSI's appraisal to report on the estate tax return the total value of the receivables of $7,479,000 includible in the gross estate.

Procedural Facts

On December 5, 2013, respondent issued two notices of deficiency to the estate.[5] One notice of deficiency was for gift tax liability for tax year 2006 and determined a deficiency of $13,800,179 and a section 6662 penalty of $2,760,036. In the notice respondent determined that the estates had failed to report total gifts of $29.9 million, the total amount of the policy premiums paid for the six split-dollar life insurance policies in 2006. On March 5, 2014, the estate timely filed a petition for redetermination of the adjustments in both notices.

---

[5]The notice of deficiency for the estate's estate tax liability includes an adjustment of $32,060,070 from the $7,479,000 total value of receivables as originally reported by the estate. The estate tax notice of deficiency alternatively characterizes the split-dollar life insurance arrangements as loans under sec. 1.7872-15(a)(2)(i), Income Tax Regs., but does not calculate adjustments under that regulation.

On January 2, 2015, the estate moved for partial summary judgment under Rule 121 on the issue of whether the split-dollar life insurance arrangements should be governed under the economic benefit regime set forth in section 1.61-22, Income Tax Regs.

## Discussion

I. Summary Judgment

The purpose of summary judgment is to expedite litigation and avoid costly, time-consuming, and unnecessary trials. Fla. Peach Corp. v. Commissioner, 90 T.C. 678, 681 (1988). Under Rule 121(b), the Court may grant summary judgment when there is no genuine dispute as to any material fact and a decision may be rendered as a matter of law. Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), aff'd, 17 F.3d 965 (7th Cir. 1994). In deciding whether to grant summary judgment, we construe factual materials and inferences drawn from them in the light most favorable to the nonmoving party. Id. However, the nonmoving party may not rest upon mere allegations or denials but instead must set forth specific facts showing that there is a genuine dispute for trial. Rule 121(d); see Sundstrand Corp. v. Commissioner, 98 T.C. at 520.

Respondent contends that there are genuine issues of material fact still in dispute which would render summary judgment with respect to the split-dollar life

insurance arrangements at issue in this case inappropriate. The parties agree that the CMM Trust provided $29.9 million to the Dynasty Trusts to purchase the policies and that the Dynasty Trusts are the named owners of the policies. Respondent, however, argues that the estate's motion should be denied on the basis that the issue as to whether the CMM Trust provided the Dynasty Trusts with an economic benefit other than the cost of current life insurance protection, as defined under section 1.61-22(d)(3), Income Tax Regs., is a material issue of fact.

We disagree. The question in this case of whether any additional economic benefit was provided other than current life insurance protection is purely legal.

## II.     Split-Dollar Life Insurance Arrangements in General

The IRS issued final regulations in September 2003 that govern all split-dollar life insurance arrangements entered into or materially modified after September 17, 2003 (final regulations). The final regulations define a split-dollar life insurance arrangement as an arrangement between an owner and a nonowner of a life insurance contract in which: (i) either party to the arrangement pays, directly or indirectly, all or a portion of the premiums on the life insurance contract; and (ii) the party paying for the premiums is entitled to recover all or any portion of those premiums, and such recovery is to be made from, or is secured by, the proceeds of the life insurance contract. Id. para. (b)(1).

The split-dollar life insurance arrangements at issue are governed by the final regulations because they are split-dollar life insurance arrangements entered into after September 17, 2003, and they are between the CMM Trust and the Dynasty Trusts. The CMM Trust has paid a portion of the premiums on the policies; it is entitled to recover, at a minimum, all of those premiums paid, and this recovery is to be made from, or is secured by, the proceeds of the policies.

The final regulations provide two mutually exclusive regimes for taxing split-dollar life insurance arrangements entered into (or materially modified) after September 17, 2003, either the economic benefit regime or the loan regime. Id. subpara. (3)(i); see Our Country Home Enters., Inc. v. Commissioner, 145 T.C. __, __ (slip op. at 29) (July 13, 2015).

The determination of which regime applies to a split-dollar life insurance arrangement depends on which party owns, or is deemed to own, the life insurance policy subject to the arrangement. Generally, the person named as the owner in the insurance contract is treated as the owner of the contract. Sec. 1.61-22(c)(1), Income Tax Regs. A nonowner is any person other than the owner who has any direct or indirect interest in the contract. Id. subpara. (2). Under this general rule, the Dynasty Trusts would be considered the owners of the policies and the loan regime would apply.

As an exception to the general rule, the final regulations include a special ownership rule that provides that if the only economic benefit provided under the split-dollar life insurance arrangement to the donee is current life insurance protection, then the donor will be the deemed owner of the life insurance contract, irrespective of actual policy ownership, and the economic benefit regime will apply. Id. subpara. (1)(ii)(A)(2). If, on the other hand, the donee receives any additional economic benefit, other than current life insurance protection, then the donee will be considered the owner and the loan regime will apply. Id.

Thus, the key question in this case that determines which party owns, or is deemed to own, a life insurance policy is whether the lump-sum payment of premiums made on the policies indirectly by the CMM Trust generated any additional economic benefit other than current life insurance protection to the Dynasty Trusts. If there is no additional economic benefit to the Dynasty Trusts, then the CMM Trust will be the deemed owner of the policies by way of the special ownership rule and the split-dollar life insurance arrangements will be governed by the economic benefit regime. If any additional economic benefit is conferred, then the Dynasty Trusts will own the policies and the loan regime will apply.

As a threshold matter, the preamble to the final regulations includes an example that is structured identically to the split-dollar life insurance arrangements at issue. The preamble distinguishes between a donor, or the donor's estate, who is entitled to receive an amount equal to the greater of the aggregate premiums paid by the donor or the CSV of the contract and a donor, or the donor's estate, who is entitled to receive the lesser of those two values. T.D. 9092, sec. 5, Gift Tax Treatment of Split-Dollar Life Insurance Arrangements, 2003-2 C.B. 1055, 1062. In the former situation, the donor makes a gift to the donee equal to the cost of the current life insurance protection provided less any premium amount paid by the donee. Id. In the latter situation, the value of the donor's gift of economic benefits equals the cost of current life insurance protection provided, the amount of policy cash value to which the trust has current access, and the value of any other economic benefits, less the amount of premiums paid by the donee. Id. Thus, it follows that where a donor is to receive the greater of the aggregate premiums paid or the CSV of the contract, the possibility of the donee receiving an additional economic benefit is foreclosed.

We are aware that the Court has previously been unpersuaded by a preamble to regulations. See Allen v. Commissioner, 118 T.C. 1, 17 n.12 (2002) ("In addition to the obvious fact that these documents also are not items of legislative

history, these documents are afforded little weight in this Court." (citing Dobin v. Commissioner, 73 T.C. 1121, 1127 n.9 (1980))). We are not bound by the preamble, but because it is an agency's interpretation of its statute, we apply the standard enunciated by the Supreme Court in Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944). Therefore, the Commissioner is entitled to at least the lowest level of deference in interpreting his own regulations and their statutes. See United States v. Mead Corp., 533 U.S. 218, 221 (2001); ADVO, Inc. v. Commissioner, 141 T.C. 298, 322 (2013); Armco, Inc. v. Commissioner, 87 T.C. 865, 868 (1986) (explaining how a preamble is drafted and that it is a statement of intent that represents the institutional viewpoint). Here, however, the preamble is consistent with the estate's interpretation of the statute and contrary to respondent's position. While we find the logic of the preamble sound, to be thorough we will articulate why, under the final regulations, the economic benefit regime applies.

## III. Economic Benefit Regime

For a split-dollar life insurance arrangement to be taxed under the economic benefit regime, the owner or deemed owner will be treated as providing an annual benefit to the nonowner in an amount equal to the value of the economic benefits provided under the arrangement, reduced by any consideration the nonowner pays

for the benefits. Sec. 1.61-22(d)(1), Income Tax Regs. The value of the economic benefits provided to the nonowner for a taxable year under the arrangement is equal to the sum of (i) the cost of current life insurance protection, (ii) the amount of cash value to which the nonowner has current access during the year, and (iii) any economic benefits not otherwise described that are provided to the nonowner. Id. subpara. (2).

The cost of the current life insurance protection takes into account the life insurance premium factors that the Commissioner publishes for this purpose. See id. subpara. (3)(ii). The amount of the current life insurance protection is the death benefit of the life insurance contract (including paid-up additions) reduced by the sum of the amount payable to the owner plus the portion of the cash value taxable to (or paid for by) the nonowner. See id. subdiv. (i). The amount of the insurance policy cash value is determined disregarding surrender charges or other similar charges or reductions and including insurance policy cash value attributable to paid-up additions. See id. subpara. (4)(i).

To determine whether any additional economic benefit was conferred by the CMM Trust to the Dynasty Trusts, the relevant inquiry is whether the Dynasty Trusts had current access to the cash values of their respective policies under the

split-dollar life insurance arrangements or whether any other economic benefit was provided.

A.     Current Access

The final regulations provide that the nonowner has current access to any portion of the policy cash value to which the nonowner (i) has a current or future right and (ii) that currently is directly or indirectly accessible by the nonowner, inaccessible to the owner, or inaccessible to the owner's general creditors. Id. subdiv. (ii). If the Dynasty Trusts have current access to any portion of the policy cash value, then the special ownership rule will not apply, the Dynasty Trusts will be considered the owners of their respective policies under the general ownership rule, and the split-dollar life insurance arrangements will be governed by the loan regime.

For the Dynasty Trusts to have current access under the final regulations, the Dynasty Trusts must first have a current or future right to any portion of the policy cash value. The split-dollar life insurance arrangements are structured so that upon the termination of a split-dollar life insurance arrangement during the lifetime of the insured, 100% of the CSV (including CSV attributable to premiums paid by the Dynasty Trusts) would be paid to the CMM Trust. Additionally, if a split-dollar life insurance arrangement were to terminate as a result of the death of

the insured, the Dynasty Trusts would be entitled to receive only that portion of the death benefit of the policy in excess of the receivable payable to the CMM Trust. Accordingly, under the split-dollar life insurance arrangements the Dynasty Trusts had no current or future right to any portion of the policy cash value, and thus, no current access under the regulations.

Respondent argues that the Dynasty Trusts had a direct or indirect right in the cash values of the insurance policies by virtue of the terms of the 2006 Amendment to the CMM Trust. Under that amendment, the CMM Trust's interest in the cash values of the policies would pass to the Dynasty Trusts or directly to Mrs. Morrissette's sons or their heirs upon her death. However, because the CMM Trust was a revocable trust with respect to Mrs. Morrissette, she retained an absolute right to alter the CMM Trust throughout her lifetime. Accordingly, the Dynasty Trusts did not have a legally enforceable right to the cash values of the policies during the lifetime of the grantor. Furthermore, the split-dollar life insurance arrangements did not require the CMM Trust to distribute the receivables to the Dynasty Trusts. Rather, Mrs. Morrissette retained the right to receipt of the receivables.

The final regulations specifically provide that a nonowner must have a current or future right to cash value under the arrangements:

In the case of a split-dollar life insurance arrangement subject to the rules of paragraphs (d) through (g) of this section, economic benefits are treated as being provided to the non-owner of the life insurance contract. The non-owner (and the owner for gift and employment tax purposes) must take into account the full value of all economic benefits described in paragraph (d)(2) of this section * * *

Sec. 1.61-22(d)(1), Income Tax Regs. When the final regulations state that "[t]he value of the economic benefits provided to a non-owner for a taxable year under the arrangement equals * * * [t]he amount of policy cash value to which the non-owner has current access within the meaning of paragraph (d)(4)(ii) of this section", the regulations are referring to the split-dollar life insurance arrangement. Id. subpara. (2) (emphasis added). The 2006 Amendment to the CMM Trust is not part of the split-dollar life insurance arrangements between the CMM Trust and the Dynasty Trusts.

Under each split-dollar life insurance arrangement, upon the death of the insured, the CMM Trust would be entitled to receive a portion of the death benefit of the policies insuring the life of the deceased equal to the greater of (i) the CSV of the applicable policies or (ii) the aggregate premium payments made with respect to the applicable policies. The CMM Trust obtained the receivables as a result of entering into the split-dollar life insurance arrangements. Thus, it was appropriate to execute the 2006 amendment to provide for the disposition of these

assets. Importantly, the split-dollar life insurance arrangement do not address the disposition of the receivables by the CMM Trust and did not require or permit the receivables be distributed to the Dynasty Trusts. Thus, the Dynasty Trusts did not have a direct or indirect right in the cash values of the policies by virtue of the terms of the 2006 amendment.

B.    <u>Any Other Economic Benefit</u>

Respondent argues that the circumstances referenced in Notice 2002-59, 2002-2 C.B. 481, apply to the split-dollar life insurance arrangements at issue prohibiting the use of the economic benefit regime. Notice 2002-59, sec. 3.01, 2002-2 C.B. at 482, states:

> Treasury and the Service understand that, under certain split-dollar life insurance arrangements (some of which are referred to as "reverse" split-dollar), one party holding a right to current life insurance protection uses inappropriately high current term insurance rates, prepayment of premiums, or other techniques to confer policy benefits other than current life insurance protection on another party. The use of such techniques by any party to understate the value of these other policy benefits distorts the income, employment, or gift tax consequences of the arrangement and does not conform to, and is not permitted by, any published guidance.

Notice 2002-59, <u>supra</u>, is mainly focused on reverse split-dollar life insurance arrangements. Under a typical reverse split-dollar life insurance arrangement, an irrevocable life insurance trust (ILIT) purchases a large life

insurance policy, and the insured and the ILIT enters into a split-dollar life insurance arrangement. Under this arrangement, the insured is entitled to the policy's death benefit and in return pays the ILIT the greater of the actual cost of one-year term insurance or the P.S. 58 rate.[6] This arrangement is the opposite of the typical split-dollar life insurance arrangement and thus is referred to as "reverse split-dollar". Because life insurance costs have decreased substantially since the P.S. 58 rates were set by the IRS, the insured's payment of economic benefits using the P.S. 58 rates would be substantially greater than the actual mortality charges incurred by the ILIT. With a large policy, the insured could transfer significant sums to the ILIT and, on the basis of older IRS rulings, incur little or no gift tax costs. In the most abusive cases, the insured would prepay the P.S. 58 economic benefit amounts for several years. After a few years, the parties usually terminate the arrangement. The ILIT, flush with cash from the excess payments from the insured, either maintains the policy or cashes it out.

---

[6]The "P.S. 58" rates are the one-year premium rates set forth in Rev. Rul. 55-747, 1995-2 C.B. 228, used to determine the value of current life insurance protection provided under a split-dollar life insurance arrangement. Notice 2001-10, 2001-1 C.B. 459, revoked Rev. Rul. 55-747, supra, and provided "Table 2001" as the premium rate table to determine the value of current life insurance protection. The premium rates set forth in Table 2001 are materially lower than the P.S. 58 rates at all ages.

Notice 2002-59, supra, explains that a party to a split-dollar life insurance arrangement can use the Table 2001 rates or the insurer's lower premium rates to value the current life insurance protection only if the protection is conferred as an economic benefit by one party to another. In other words, the party to a split-dollar life insurance arrangement who is entitled to current life insurance protection cannot use Table 2001 or the insurer's published premium rates to determine the value of the policy benefits he or she should pay to the other party.

The split-dollar life insurance arrangements between the CMM Trust and the Dynasty Trusts bear no resemblance to the transactions Notice 2002-59, supra, is prohibiting. Mrs. Morrissette, who was 94 at the time she set into motion these arrangements, wanted the Interstate Group to remain in her family. To that end, she caused the CMM Trust to pay a lump-sum premium, through the Dynasty Trusts, on the life insurance policies held on the lives of her sons, the proceeds of which would be employed to purchase the stock held by each of her sons upon his death. Unlike the reverse split-dollar life insurance arrangements described in the notice, the receivables the CMM Trust obtained in exchange for its advances provided the CMM Trust sole access to the CSV of the policies.

Additionally, respondent argues that the "prepaid premiums" pay not only for current insurance protection, but also for future protection, which is a benefit

other than current life insurance protection and requires that the arrangement be taxed under the loan regime. This position relies on Notice 2002-59, supra, for the proposition that prepayment of future premiums (by paying a single premium) confers policy benefits other than current life insurance protection. This assertion, however, assumes that the Dynasty Trusts would otherwise be required to pay the premiums. Under the split-dollar life insurance arrangements, the Dynasty Trusts are not required, but are permitted, to pay any portion of the policies' premiums. The split-dollar life insurance arrangements were structured such that the CMM Trust was obligated to pay all the premiums. Thus, under the split-dollar life insurance arrangements, regardless of how the CMM Trust elected to pay the premiums (whether in one lump sum or over any number of installments), the CMM Trust would not relieve the Dynasty Trusts of any obligation to pay premiums because the Dynasty Trusts were not required to pay any premiums.

IV.   Conclusion

Because the Dynasty Trusts received no additional economic benefit beyond that of current life insurance protection, the CMM Trust is the deemed owner of the life insurance contract by way of the special ownership rule under section 1.61-22, Income Tax Regs. Thus the economic benefit regime under section 1.61-

22, Income Tax Regs., and not the loan regime of section 1.7872-15, Income Tax Regs., applies to the split-dollar life insurance arrangements.

In reaching our holdings herein, we have considered all arguments the parties made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>An appropriate order will be issued granting petitioners' motion for partial summary judgment</u>.