T.C. Memo. 2018-155

UNITED STATES TAX COURT

RUBEN DE LOS SANTOS AND MARTHA DE LOS SANTOS, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5458-16.                          Filed September 18, 2018.

David M. Henderson, for petitioners.

Elizabeth S. McBrearty, David Weiner, and Angela B. Reynolds, for

respondent.

MEMORANDUM OPINION

LAUBER, Judge:  With respect to petitioners' Federal income tax for 2011

and 2012, the Internal Revenue Service (IRS or respondent) determined deficien-

cies of $588,637 and $615,546, respectively.  It also determined accuracy-related

penalties under section 6662A, which covers "reportable transaction understate-

[*2] ments," and alternatively under section 6662(a).[1]  Currently before the Court are the parties' cross-motions for partial summary judgment.

Petitioner husband was the sole shareholder of an S corporation that employed him and his wife.  It made contributions of $1.8 million to an employee welfare benefit plan, which purchased a life insurance policy with a face value of $12.5 million covering petitioners' lives.  The question presented is whether this arrangement generated current taxable income for petitioners as a "split-dollar" life insurance arrangement under section 1.61-22(b), Income Tax Regs.

The arrangement here resembles the split-dollar arrangement we considered in Our Country Home Enters., Inc. v. Commissioner, 145 T.C. 1 (2015).  Reaching similar conclusions here to those we reached there, we will grant respondent's motion for partial summary judgment and deny petitioners' cross-motion.

Background

There is no dispute as to the following facts, which are drawn from the parties' motion papers, the stipulation of facts, and the exhibits attached thereto.  Petitioners resided in Texas when they petitioned this Court.

---

[1]All statutory references are to the Internal Revenue Code (Code) in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round all monetary amounts to the nearest dollar.

**[*3]** Petitioner husband is a medical doctor. During the tax years at issue he was the sole shareholder of Dr. Ruben De Los Santos MD, PA, an S corporation incorporated in Texas (S Corp.) The S Corp. employed Dr. De Los Santos and his wife, who served as the office manager for the medical practice, as well as four other individuals. Petitioners received annual salaries of $216,000 and $54,000, respectively. Petitioner husband also included in his income, as the sole shareholder of the S Corp., 100% of its items of income and expense. See sec. 1366.

A.    The Legacy/Flex Plan

In July 2004 Legacy Benefit Plans, LLC, an Illinois company (LBP), established the Legacy Employee Welfare Benefit Plan (Legacy Plan). The Legacy Plan was a purported multiple-employer welfare benefit plan under section 419A(f)(6). At all relevant times LBP was the sponsor and administrator of the Legacy Plan.

An employer elected to participate in the Legacy Plan by adopting a welfare benefit plan pursuant to the terms of a master plan. The Legacy Plan offered living benefits, including disability benefits, and death benefits. The latter were ultimately payable, upon the death of a covered employee, to that person's spouse or designated beneficiary.

**[*4]** Participating employers selected the types of benefits to be provided to their employees. No employee had any right to withdraw from, borrow against, or surrender his interest in the Legacy Plan. An employee covered by the Legacy Plan designated the beneficiary or beneficiaries who would receive death benefits to which that employee was entitled.

The Legacy Plan was funded by employer contributions to the Legacy Employee Welfare Benefit Trust (Legacy Trust). LBP determined the amount of such contributions through a rate chart, which took into account common risk factors such as age, gender, number of covered dependents, and benefit terms. The employees themselves made no contributions to the Legacy Trust and otherwise made no financial commitment to the Legacy Plan. At no time was the Legacy Trust recognized by the IRS as tax-exempt under section 501(a).

All employer contributions to the Legacy Trust were irrevocable and were thereafter inaccessible by the participating employer and its creditors. Participating employers and their creditors had no access to the income or assets (including insurance contracts) held by the Legacy Trust. In no event could the assets held by the Legacy Trust be used for any purpose other than funding benefits for participating employees and their beneficiaries or defraying expenses of plan ad-

[*5] ministration.  The Legacy Trust invested the contributed funds in multiple asset classes, including cash, stock, bonds, and life insurance contracts.

In December 2010 the Legacy Plan was merged into the Legacy Employee Flex Benefit Plan (Flex Plan).  The Legacy Trust thereupon transferred its assets to the Legacy Employee Flex Benefit Trust (Flex Trust).  The Flex Plan enabled participating employers to offer their employees a wider range of living benefits, such as day care and vacation benefits.  But the operative provisions of the Flex Plan and the Flex Trust were otherwise substantially similar to the operative provisions of the Legacy Plan and the Legacy Trust as described above.  For convenience we will sometimes refer to these entities collectively as the Legacy/Flex Plan and the Legacy/Flex Trust.

B.  The S Corp.'s Participation in the Legacy/Flex Plan

In October 2006 the S Corp. elected to participate in the Legacy Plan by executing an adoption agreement with an effective date of November 14, 2006.  The S Corp. selected the benefits to be provided to petitioners and its four other employees under the Legacy Plan.  Petitioners were entitled thereunder to a $12.5 million death benefit, and the S Corp.'s four rank-and-file employees were entitled to a $10,000 accidental death and dismemberment (AD&D) benefit.  Under the Flex Plan petitioners continued to receive a $12.5 million death benefit; the rank-

[*6] and-file employees received a $10,000 death benefit and several flexible benefits, including a critical illness benefit and a prepaid legal benefit.

The Legacy Plan required that life insurance be purchased to fund the promised death benefits. In January 2007 the Legacy Trust accordingly purchased a life insurance policy (Policy) insuring the lives of petitioners. The Policy, issued by American General Life Insurance Co. (AGLI), was a "flexible premium variable universal life" policy, with accumulation values based on the investment experience of a separate fund. The Policy provided base insurance coverage of $12.5 million, equal to the death benefit that the S Corp. had selected for petitioners. The Legacy Trust (later the Flex Trust) was named as the owner and beneficiary of the Policy.[2]

AGLI considered several risk factors when issuing the Policy, including petitioners' age and status as nonsmokers. (At the time petitioner husband was age 54 and his wife was age 47.) The policy was a survivor policy, under which AGLI would pay $12.5 million to the Legacy Trust when the second of petitioners died.

---

[2]The original Policy documents list the policy owner as the "Legacy Employee Benefit Plan and Trust." But the parties have stipulated that the Legacy Trust was "the owner and beneficiary" of the Policy when it was issued in 2007. In October 2011 the Flex Trust was substituted as the policy owner and beneficiary.

[*7] The Legacy Trust in turn would pay $12.5 million to the beneficiary or beneficiaries whom petitioners had designated.

The Legacy Trust invoiced the S. Corp. for the required upfront contributions. Each invoice showed $100 as the cost of AD&D coverage for the four rank-and-file employees, with the balance attributable to the cost of the Policy. During 2006-2010 the S Corp. made to the Legacy Trust the following contributions, which it treated as tax-deductible expenses of the medical practice:

| Date | Contribution |
|------|-------------|
| 11/14/2006 | $372,446 |
| 12/05/2007 | 372,446 |
| 10/08/2008 | 372,486 |
| 11/19/2009 | 372,485 |
| 10/27/2010 | 372,486 |
| Total | 1,862,349 |

During 2007-2012 the Legacy Trust (and later the Flex Trust) paid premiums on the Policy as follows:

| Date | Premium paid |
|------|-------------|
| 02/24/2007 | $353,767 |
| 03/24/2008 | 353,767 |
| 02/20/2010 | 75,000 |
| 02/24/2011 | 51,000 |
| 02/24/2012 | 51,000 |
| Total | 884,534 |

[*8] Because of these premium payments and the investment gains thereon, the "accumulation value" of the Policy was $640,358 at the end of 2011 and $744,460 at the end of 2012, according to the quarterly statements issued by AGLI.

If an employer participating in the Flex Plan made all required contributions before December 1, 2011, and thereafter terminated participation, employees who were entitled to death benefits would continue to receive that coverage for the rest of their lives. The S Corp. had made, by October 27, 2010, all contributions required to fund the promised death benefits. Because subsequent events could not cause petitioners to lose their entitlement to the $12.5 million death benefit, they were fully vested in that benefit during the tax years at issue.

## C.    Tax Return Filings

Petitioners timely filed joint Federal income tax returns for 2011 and 2012, reporting adjusted gross income of $830,370 and $927,797, respectively. They did not report on these returns any income related to their participation in the Legacy/Flex Plan. On December 4, 2015, the IRS issued petitioners a timely notice of deficiency for 2011 and 2012, in which it determined deficiencies and penalties on the basis that petitioners had received taxable economic benefits from their participation in the Legacy/Flex Plan. Petitioners timely petitioned this Court for redetermination.

**[*9]**                                             <u>Discussion</u>

The purpose of summary judgment is to expedite litigation and avoid un-necessary and time-consuming trials.  See <u>FPL Grp., Inc. & Subs. v. Commission-er</u>, 116 T.C. 73, 74 (2001).  We may grant summary judgment or partial summary judgment when there is no genuine dispute of material fact and a decision may be rendered as a matter of law.  Rule 121(b); <u>Elec. Arts, Inc. v. Commissioner</u>, 118 T.C. 226, 238 (2002).  The parties agree on all material facts relevant to the issues we must decide, and they have expressed that consensus by filing cross-motions for partial summary judgment.  We conclude that these issues may be adjudicated summarily.

Respondent contends that the Policy issued on petitioners' lives incident to their participation in the Legacy/Flex Plan was part of a compensatory split-dollar life insurance arrangement under section 1.61-22(b)(2), Income Tax Regs., and that petitioners must include in gross income the economic benefits thus conferred on them.  Petitioners do not dispute that economic benefits received from a split-dollar life insurance arrangement constitute taxable income.  Rather, they contend that their participation in the Legacy/Flex Plan did not involve a split-dollar ar-rangement.

**[*10]** A.     Governing Legal Framework

The term "split-dollar" was originally applied to life insurance arrangements under which an employer paid part of the premiums on a policy insuring an employee's life, with the understanding that the employer would recover part or all of the premiums from the insurance proceeds. See Rev. Rul. 64-328, 1964-2 C.B. 11, revoking Rev. Rul. 55-713, 1955-2 C.B. 23. In September 2003 the Department of the Treasury issued final regulations that define split-dollar life insurance arrangements more comprehensively. T.D. 9092, 2003-2 C.B. 1055; see sec. 1.61-22, Income Tax Regs. These regulations govern all split-dollar life insurance arrangements entered into or materially modified after September 17, 2003. Sec. 1.61-22(j), Income Tax Regs.; see Our Country Home Enters., Inc., 145 T.C. at 38-39. The parties agree that these regulations govern the outcome here.

The regulations generally define a split-dollar life insurance arrangement to include any arrangement (other than group-term life insurance) between an owner of a life insurance contract and a non-owner of the contract if certain conditions are met. Sec. 1.61-22(b)(1), Income Tax Regs. One of these conditions is that one party must be entitled to recover from the insurance proceeds "all or any portion" of the premiums previously paid. Id. subpara. (1)(ii). Because the arrangement at issue here does not meet that condition, respondent does not contend that petition-

**[\*11]** ers' participation in the Legacy/Flex Plan constituted a split-dollar arrangement under the general definition set forth in the regulations.

The regulations set forth a "special rule," however, that applies "regardless of whether the criteria of paragraph (b)(1) of this section are satisfied." Id. subpara. (2)(i). Under this special rule, an arrangement is treated as a split-dollar life insurance arrangement if it is either a compensatory arrangement or a shareholder arrangement. See id. subpara. (2)(ii) and (iii). Because neither party contends that the Legacy/Flex Plan involved a shareholder arrangement, the question we must decide is whether it constituted a compensatory arrangement.

An arrangement between an owner and a non-owner of a life insurance contract constitutes a compensatory arrangement if three conditions are met. First, the arrangement must be entered into "in connection with the performance of services" and must not be "part of a group-term life insurance plan described in section 79." Id. subdiv. (ii)(A). Second, the employer or other service recipient must pay, "directly or indirectly, all or any portion of the premiums" on the policy. Id. subdiv. (ii)(B). Third, as relevant here, the beneficiary of the death benefit must be "designated by the employee or service provider" or must be a person "whom the employee or service provider would reasonably be expected to designate as the beneficiary." Id. subdiv. (ii)(C)(1).

**[*12]** "[T]he person named as the policy owner of [a life insurance] contract generally is the owner of such contract." Id. para. (c)(1). However, the regulations include attribution rules that apply in the case of compensatory arrangements. See id. subpara. (1)(iii). If the arrangement is entered into in connection with the performance of services, the employer or other service recipient "is treated as the owner of the life insurance contract" if the owner is (among other things) a "welfare benefit fund within the meaning of section 419(e)(1)." Id. subdiv. (iii)(C).

The Federal income tax consequences of a split-dollar life insurance arrangement are generally determined either through the economic benefit provisions of section 1.61-22(d) through (g), Income Tax Regs., or through the loan provisions of section 1.7872-15, Income Tax Regs. See Estate of Morrissette v. Commissioner, 146 T.C. 171, 179 (2016); Our Country Home Enters, Inc., 145 T.C. at 49-50. The parties agree that, if we find the Legacy/Flex Plan to involve a split-dollar life insurance arrangement, the economic benefit provisions will apply here. Under those provisions, the owner of the life insurance contract is treated as providing current economic benefits to the non-owner of the policy. See sec. 1.61-22(d)(1), Income Tax Regs.

[*13] B.    Analysis

Petitioners first contend that there can be no split-dollar arrangement here because the Legacy/Flex Plan is not "life insurance." This contention is misguided. The regulations provide that a compensatory split-dollar arrangement exists if specified criteria are met with respect to an owner and a non-owner of "a life insurance contract." Sec. 1.61-22(b)(2), Income Tax Regs. Petitioners do not dispute (and they could not plausibly dispute) that the Policy is a "life insurance contract" as defined by section 7702(a). The Policy was issued by AGLI, a life insurance company, and provides insurance of $12.5 million on petitioners' lives.

Petitioners contend that the Legacy/Flex Plan is not life insurance because it lacks a sufficient element of risk. But it is irrelevant under the regulations whether the Legacy/Flex Plan as whole constitutes life insurance. The relevant fact is that this Plan required that life insurance be purchased to fund the promised death benefit, and the Trust purchased the Policy for that reason.

The first step of the analysis requires that we identify the owner of the Policy under the regulatory attribution rules. The Legacy Trust (later the Flex Trust) was the named owner of the Policy. But when a split-dollar arrangement is entered into in connection with the performance of services, the employer "is treated as the owner of the life insurance contract" if the actual owner is (among

**[*14]** other things) a "welfare benefit fund within the meaning of section 419(e)(1)." Sec. 1.61-22(c)(1)(iii)(C), Income Tax Regs.

Section 419(e)(1) defines a welfare benefit fund as a fund that is part of an employer plan and through which the employer "provides welfare benefits to employees or their beneficiaries." Section 419(e)(2) generally defines a welfare benefit as any benefit other than a benefit covered by section 83(h) (property transferred in connection with performance of services), section 404 (deferred payment plan), or section 404A (foreign deferred compensation plan).

Petitioners do not challenge the status of the Legacy Trust (and later the Flex Trust) as a welfare benefit fund within the meaning of section 419(e)(1). Section 419(e)(3) defines a fund to include "any trust, corporation, or other organization not exempt" from Federal income tax. Neither the Legacy Trust nor the Flex Trust was tax exempt under section 501(a). Each trust was "part of the plan of an employer" through which the S Corp. "provide[d] welfare benefits to employees or their beneficiaries." See sec. 419(e)(1)(A) and (B). And the benefits thus provided were welfare benefits because they were not covered by section 83(h), 404, or 404A. See sec. 419(e)(2). For purposes of applying the split-dollar regulations, therefore, the S Corp. is treated as the owner of the Policy and petitioners are treated as the "non-owners." See sec. 1.61-22(c)(1) and (2), Income

**[\*15]** Tax Regs.; cf. <u>Our Country Home Enters., Inc.</u>, 145 T.C. at 40 (reaching the same conclusion on the basis of the taxpayer's concession).

The first prong of the test for a compensatory arrangement requires that the arrangement between the owner and the non-owner be entered into "in connection with the performance of services" and not be "part of a group-term life insurance plan described in section 79." Sec. 1.61-22(b)(2)(ii)(A), Income Tax Regs. Petitioners concede that the S Corp. provided them benefits under the Legacy/Flex Plan "in connection with the performance of services." However, they contend that the insurance coverage they received under the Policy was part of a "group-term life insurance plan." That is assertedly so because all of the S Corp.'s eligible employees "received death benefits from the Flex Plan, in varying amounts," and because eligibility to receive such benefits "was based solely on factors related to employment," such as years of service.

Petitioners' argument misses the mark for at least two reasons. First, the insurance coverage that funds petitioners' promised death benefits is not group-term life insurance. <u>See</u> sec. 79(a). The Policy insuring petitioners' lives covers them alone, and it does not provide term insurance. Rather, it is a self-described "flexible premium variable universal life insurance" policy with accumulation values based on the investment experience of a separate fund. <u>See</u> <u>Norem v.</u>

[*16] <u>Lincoln Ben. Life Co.</u>, 737 F.3d 1145, 1147 (7th Cir. 2013) (distinguishing a "Flexible Premium Variable Life Insurance Policy" from term life insurance).

Second, "[l]ife insurance is not group-term life insurance for purposes of section 79" unless "[t]he amount of insurance provided to each employee is computed under a formula that precludes individual selection." Sec. 1.79-1(a)(4), Income Tax Regs. This requirement is not satisfied if the formula takes into account the personal risk characteristics of particular employees. <u>See</u> <u>Our Country Home Enters., Inc.</u>, 145 T.C. at 41-42.

Eligibility to receive benefits under the Legacy/Flex Plan was open to all six S Corp. employees. But petitioners have not established that "[t]he <u>amount</u> of insurance provided to each employee [wa]s computed under a formula that precludes individual selection." <u>See</u> sec. 1.79-1(a)(4), Income Tax Regs. (emphasis added). Petitioners were entitled to a death benefit of $12.5 million. Each petitioner enjoyed the same benefit, even though petitioner husband was seven years older than his wife and earned a salary four times higher. The four rank-and-file employees were entitled to no death benefits under the Legacy Plan (only to a $10,000 AD&D benefit) and were entitled under the Flex Plan to a modest death benefit of $10,000.

**[\*17]** Petitioners have not explained what computational formula--based on age, compensation, or other objective criteria--could produce a distribution of benefits that looks like this. Even if there were some "theoretical possibility" that this disparity could have resulted without individual selection, the formula "did not in fact preclude individual selection." See Whitcomb v. Commissioner, 81 T.C. 505, 519 (1983), aff'd, 733 F.2d 191 (1st Cir. 1984). It seems obvious that the discriminatory pattern displayed by the S Corp.'s selection of benefits reflected "individual selection" by or on behalf of petitioners. See Towne v. Commissioner, 78 T.C. 791, 798 (1982) (holding that an insurance policy was not part of a group-term insurance plan because it individually selected the company's president to receive $500,000 of excess coverage). Moreover, the Policy insuring petitioners' lives took into account their personal risk characteristics, including their nonsmoker status. See Our Country Home Enters., Inc., 145 T.C. at 42.

The second prong of the test for a compensatory arrangement requires that the employer or other service recipient pay, "directly or indirectly, all or any portion of the [life insurance] premiums." Sec. 1.61-22(b)(2)(ii)(B), Income Tax Regs. During 2006-2010 the S Corp. made contributions in excess of $1.8 million to the Legacy Trust, which used those contributions to pay premiums of $884,534

**[\*18]** on the Policy insuring petitioners' lives. The S Corp. was petitioners' employer and it paid (through the Legacy Trust) all of the premiums on the Policy.

Petitioners contend that the second prong is unsatisfied because the Legacy Trust did not pay these premiums immediately upon receipt of the S Corp.'s contributions, but several months or years later, after commingling the cash with cash supplied by other participating employers. This argument ignores the language of the regulation, which states that an employer can effect premium payments "directly or indirectly." Ibid. By supplying the Legacy Trust with the cash to pay the premiums, the S Corp. paid those premiums indirectly. The regulations contemplate exactly this sort of indirect payment by providing that the employer will be treated as the owner of a life insurance contract that is actually owned (for example) by a welfare benefit fund. See id. para. (c)(1)(iii)(C), Income Tax Regs. In such cases, the employer will typically supply to the fund (or to its associated trust) the cash with which to pay the premiums, as happened here.

The third prong of the test for a compensatory arrangement requires either that the employee have an "interest in the policy cash value of the life insurance contract" or that the beneficiary of the death benefit be "designated by the employee" or be a person whom the employee "would reasonably be expected to designate as the beneficiary." Id. para. (b)(2)(ii)(C). The latter requirement is clearly

**[*19]** met here.  Petitioners admit that they named the Legacy Trust (and later the Flex Trust) as the beneficiary of the $12.5 million death benefit under the Policy.  And the Legacy Trust was obligated to pay that $12.5 million death benefit to the beneficiary or beneficiaries whom petitioners had designated.  As we concluded in Our Country Home Enters., Inc., the fact that the "proceeds from the life insurance policies are funneled through the * * * [welfare benefit] Plan to each of the ultimate recipients does not blur our view (or our conclusion) that each of those recipients is the beneficiary of the death benefit" for purposes of the split-dollar regulations.  145 T.C. at 44-45.[3]

In sum, we conclude that the arrangement at issue satisfied all three criteria required to create a compensatory arrangement under the regulations.  We accordingly hold that the Policy issued on petitioners' lives incident to their participation in the Legacy/Flex Plan was part of a compensatory split-dollar life insurance arrangement under section 1.61-22(b)(2), Income Tax Regs.

---

[3]Petitioners assert that, because the Legacy/Flex Trust was not related to them, they could not gain from naming it the beneficiary of the death benefit.  As noted in the text, we rejected this same argument in Our Country Home Enters., Inc., 145 T.C. at 44-45.  Petitioners effectively designated the recipients of the death benefit because they were assured that the Legacy/Flex Trust would immediately pay the death benefit to the beneficiary or beneficiaries whom petitioners had named.

**[\*20]** C.     Unreported Income

The Federal income tax consequences of a split-dollar life insurance arrangement are generally determined through one of two regimes:  the economic benefit regime or the loan regime.  See Our Country Home Enters., Inc., 145 T.C. at 49-50.  Compare sec. 1.61-22(a)(2), (b)(3)(i), Income Tax Regs., with sec. 1.7872-15(a)(2)(i)(B), Income Tax Regs.  The parties agree that the loan regime does not apply here.

Under the economic benefit regime, the non-owner of the life insurance contract (here, petitioners) "must take into account the full value of all economic benefits described in paragraph (d)(2) of this section, reduced by the consideration paid * * * by the non-owner to the owner for those economic benefits."  Sec. 1.61-22(d)(1), Income Tax Regs.  The parties agree that petitioners paid no consideration to the S Corp. for the benefits they received under the Legacy/Flex Plan.

As relevant here, "[t]he value of the economic benefits provided to a non-owner," id. para. (d)(2), equals the sum of two amounts.  The first amount is the "cost of current life insurance protection provided to the non-owner."  Id. subpara. (2)(i).  The parties agree that the cost of such current protection was $178 for 2011 and $213 for 2012.

**[\*21]** The second amount--the focus of dispute here--is "[t]he amount of policy cash value to which the non-owner has current access within the meaning of paragraph (d)(4)(ii) of this section (to the extent that such amount was not actually taken into account for a prior taxable year)." Id. subpara. (2)(ii). The non-owner "has current access to that portion of the policy cash value" to which he or she "has a current or future right" if specified conditions are met. Id. subpara. (4)(ii)(A). Even if the non-owner cannot extract cash from the policy currently, he is treated as having "current access" to that portion of the policy cash value to which he has a future right if such portion "is inaccessible to the owner" of the policy (i.e., the employer) or is "inaccessible to the owner's general creditors." Id. subdiv. (ii)(B).

Petitioners had a "future right" to the Policy cash value because they had the exclusive right to designate who would receive death benefits under the Policy. See Our Country Home Enters., Inc., 145 T.C. at 45-46, 53-54. Moreover, once a participating employer had made contributions to the Legacy/Flex Trust, those contributions were irrevocable and were inaccessible to the employer and its creditors. Employers and their creditors likewise had no access to the income or assets (including insurance contracts) held by the Legacy/Flex Trust. Thus, although petitioners during 2011-2012 could not withdraw funds from the Policy or the

[*22] Legacy/Flex Plan, the Policy cash value, in its entirety, was "inaccessible to the owner" (i.e., the S Corp.) and was "inaccessible to the owner's general creditors." See sec. 1.61-22(d)(4)(ii)(B), Income Tax Regs.[4]

Although the Legacy/Flex Plan documents make clear that the Policy cash value was not subject to the claims of any participating employer or its creditors, petitioners assert that a clawback provision in the bankruptcy code could lead to a different outcome. Under 11 U.S.C. sec. 548(e)(1) (2012), a bankruptcy trustee may claw back any transfers made by a debtor within 10 years of the petition date if the transfer (among other things) was made to a self-settled trust or to a similar device whose beneficiary was the debtor. This provision is irrelevant here. The Legacy and Flex Trusts were not self-settled trusts. And the S Corp., the debtor in the scenario petitioners imagine, was not a beneficiary of the Legacy or Flex Trust.

---

[4]Petitioners insist that they enjoyed no economic benefit beyond the cost of current insurance protection--i.e., $178 for 2011 and $213 for 2012--because they could not withdraw cash from the Policy or from the Legacy/Flex Plan currently. This argument ignores the governing regulation, which explicitly states that a non-owner possessing future rights "has current access to that portion of the policy cash value" that is "inaccessible to the owner" or "inaccessible to the owner's general creditors." Sec. 1.61-22(d)(4)(ii)(B), Income Tax Regs.

**[\*23]** We accordingly hold that petitioners had "current access" to the entire cash value of the Policy during 2011 and 2012. The economic benefit provided to them during those years was not limited to the cost of current life insurance protection, but also included the amount of policy cash value to which they had current access, "to the extent that such amount was not actually taken into account for a prior taxable year." Sec. 1.61-22(d)(2)(ii), Income Tax Regs. We leave to further proceedings the computation of the exact amounts to be included in petitioners' gross income for each year, as well as a determination as to whether they are liable for accuracy-related penalties under section 6662A or 6662(a).

To reflect the foregoing,

An appropriate order will be issued.