T.C. Memo. 2018-84

UNITED STATES TAX COURT

ESTATE OF RICHARD F. CAHILL, DECEASED, PATRICK CAHILL,
EXECUTOR, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10451-16.                    Filed June 18, 2018.

Jon D. Feldhammer and Timothy A. Froehle, for petitioner.

Randall G. Durfee, Aimee R. Lobo-Berg, and Randall L. Eager, Jr., for
respondent.

MEMORANDUM OPINION

THORNTON, Judge:  By notice of deficiency, respondent determined a
$6,282,202 deficiency with respect to the Estate of Richard F. Cahill (estate).
Respondent also determined penalties for negligence or disregard of rules or
regulations under section 6662(a) and (b)(1), for gross valuation misstatements

[*2] under section 6662(h), and (in the alternative) for substantial valuation misstatements under section 6662(b)(3).[1]

The notice of deficiency adjusted the total value of decedent's rights in three split-dollar life insurance arrangements from $183,700 to $9,611,624.  This case is before us on the estate's motion for partial summary judgment that sections 2036, 2038, and 2703 do not apply and that section 1.61-22, Income Tax Regs., does apply in valuing decedent's interests in these arrangements.  For the reasons discussed below, we shall deny the estate's motion for partial summary judgment.

Background

The following factual summary is based on the parties' undisputed statements of fact, as contained in the estate's motion for partial summary judgment and respondent's response thereto, and in affidavits produced by the parties, with accompanying documents.[2]

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure.  Monetary amounts are rounded to the nearest dollar.

[2]In his response to the estate's motion, respondent argues that there are genuine issues of material fact.  In its reply to respondent's response, however, the estate argues that "the facts regarding the split-dollar transactions and the documents underlying the transactions remain undisputed."  In its reply the estate concedes that it has no objection to respondent's proposed findings of fact as

(continued...)

**[*3]** Decedent, Richard F. Cahill, resided in California when he died on December 12, 2011.  The executor of decedent's estate, decedent's son Patrick Cahill, resided in Washington State when the petition was filed.  The split-dollar agreements described below were executed the year before decedent died, in 2010, when he was 90 years old and unable to manage his own affairs.

Decedent was settlor of a revocable trust, Richard F. Cahill Survivor Trust (Survivor Trust).  Patrick Cahill was trustee of Survivor Trust and decedent's attorney-in-fact under California law at all relevant times.  Unless we indicate otherwise, decedent's involvement in the three split-dollar life insurance arrangements in question was effected solely through Survivor Trust and was directed by Patrick Cahill, either as decedent's attorney-in-fact or as trustee of Survivor Trust.  The parties agree that everything in Survivor Trust on decedent's date of death is included in decedent's gross estate.

Decedent was also settlor of an irrevocable trust, Morrison Brown Trust (MB Trust), which was created on September 9, 2010, by Patrick Cahill as

---

[2](...continued)
attached to respondent's response.  And the heading of one section of the estate's reply is "Respondent's Summary of Facts Does Not Conflict with Petitioner's".  Because the estate agrees with respondent's characterization of the facts, we accept respondent's summary of facts and proposed findings of fact as undisputed for the purposes of deciding the estate's motion for partial summary judgment.

[*4] decedent's attorney-in-fact.  William Cahill (Patrick Cahill's cousin and business partner) is the trustee of MB Trust.  The primary beneficiaries of MB Trust are Patrick Cahill and his issue.

MB Trust was formed to take legal ownership of three whole life insurance policies (policies).  Two policies are on the life of Shannon Cahill, Patrick Cahill's wife, and one policy is on the life of Patrick Cahill.  Policy premiums were paid in lump sums, as follows:

| Policy | Premium | Policy amount |
|---|---|---|
| New York Life on Patrick Cahill | $5,580,000 | $40,000,000 |
| Sun Life on Shannon Cahill | 2,531,570 | 25,000,000 |
| New York Life on Shannon Cahill | 1,888,430 | 14,800,000 |
| Total | 10,000,000 | 79,800,000 |

Each policy guarantees a return on the invested portion of the premium of at least 3%.

To fund these policies, three separate split-dollar agreements (one for each policy) were executed by Patrick Cahill, as trustee of Survivor Trust, and William Cahill, as trustee of MB Trust.  Under these agreements, Survivor Trust promised to pay the policy premiums listed above; the agreements describe Survivor Trust's promise as an "advance" to MB Trust.

**[*5]**    Survivor Trust paid the premiums using funds from a $10 million loan from Northern Trust, N.A. (loan).[3]  The obligors on the loan were decedent personally (Patrick Cahill, as decedent's attorney-in-fact, arranged decedent's personal obligation) and Patrick Cahill, as trustee of Survivor Trust.[4]  The loan had a five-year term and provided for annual interest of the greater of (a) 1.5% or (b) the sum of 1.14% plus the London Interbank Offered Rate (i.e., LIBOR) for deposits with a maturity of one month.  No principal payments were required during the five-year term, and the loan documents do not require the bank to refinance at the end of the term.

Each split-dollar agreement provides that, upon the death of the insured, Survivor Trust will receive a portion of the death benefit equal to the greatest of: any remaining balance on the loan as relates to the relevant policy, the total premiums paid by Survivor Trust with respect to that policy, or the cash surrender

---

[3]Northern Trust, N.A., disbursed the loan proceeds directly to the life insurance companies.

[4]Northern Trust, N.A., took a security interest in the policies as collateral for the loan, and Survivor Trust took a subordinate security interest in the policies as collateral for MB Trust's obligations to Survivor Trust under the split-dollar agreements.  Survivor Trust promised to pay $200,000 per year to MB Trust, purportedly for Survivor Trust's use of the policies as collateral.

[*6] value of the policy immediately before the insured's death. MB Trust would retain any excess of the death benefit over the amount paid to Survivor Trust.

Each split-dollar agreement also provides that it can be terminated during the insured's life by written agreement between the trustees of Survivor Trust and MB Trust. If one of the split-dollar agreements were terminated during the insured's life, MB Trust could opt to retain the policy. In that case MB Trust would be obligated to pay Survivor Trust the greater of the total premiums Survivor Trust had paid on the policy or the policy's cash surrender value. If MB Trust did not opt to retain the policy, it would be required to transfer its interest in the policy to Northern Trust, N.A. In that case Survivor Trust would be entitled to any excess of the cash surrender value over the outstanding loan balance with respect to the policy.

Each split-dollar agreement states that MB Trust is not permitted to sell, assign, transfer, borrow against, surrender, or cancel the related policy without the consent of Survivor Trust.

In 2010 Richard Cahill reported total gifts to MB Trust of $7,578, as determined under the economic benefit regime set forth in section 1.61-22, Income Tax Regs.

[*7]  As of the date of decedent's death, the aggregate cash surrender value of the policies was $9,611,624.  The estate's tax return reported the total value of decedent's interests in the split-dollar agreements as $183,700.  In the notice of deficiency respondent adjusted the total value of decedent's rights in the split-dollar agreements from $183,700 to $9,611,624; i.e., to the aggregate cash surrender value of the policies as of decedent's date of death.

## Discussion

In exchange for decedent's payment of $10 million as premiums on the policies for MB Trust's benefit, decedent[5] received (and continued to own until he died) the right to terminate the split-dollar agreements in conjunction with the trustee of MB Trust.  Each split-dollar agreement states that, upon termination, one of two things could happen:  (1) MB Trust could opt to retain the policy, in which case decedent would immediately receive the greater of premiums paid or cash surrender value with respect to the related policy, or (2) MB Trust could decline its option to retain the policy, in which case the policy would be

---

[5]For the remainder of this opinion, unless we indicate otherwise, we will not distinguish between decedent and Survivor Trust.  The parties agree that (1) everything in Survivor Trust on decedent's date of death is included in decedent's gross estate, and that (2) at all relevant times Patrick Cahill directed decedent's affairs as decedent's attorney-in-fact and also directed Survivor Trust as trustee.

**[*8]** transferred to Northern Trust, N.A., in full or partial satisfaction of decedent's liability to Northern Trust, N.A. (We will refer to these as the termination rights.)

Additionally, each split-dollar agreement states that upon the death of the insured, decedent would receive the greatest of the remaining loan balance, premiums paid, or cash surrender value. (We will refer to these as decedent's death benefit rights.) MB Trust would receive any excess of the death benefits over the amount required to be paid to decedent. (We will refer to these as MB Trust's death benefit rights.)

On its estate tax return, the estate claimed that the aggregate value of all the rights decedent held under the split-dollar agreements, including the termination rights, was $183,700. The estate contends that (1) because decedent's right to terminate the split-dollar agreements was held in conjunction with the trustee of MB Trust and (2) because it would allegedly never make economic sense for MB Trust to allow termination of the split-dollar agreements, termination was so unlikely that the termination rights had no value as of decedent's date of death. On this basis, the estate contends that the value of decedent's interests in the split-dollar agreements is limited to the value of decedent's death benefit rights. The estate further contends that on decedent's date of death these rights were worth only $183,700, because Patrick and Shannon Cahill, the insured persons, were

[*9] then projected to live for many years, with the result that decedent's rights had only a relatively small present value.

In the notice of deficiency respondent adjusted the total value of decedent's rights in the split-dollar agreements from $183,700 to $9,611,624; i.e., to the aggregate cash surrender value of the policies as of decedent's date of death. In support of this adjustment, respondent presents alternative theories applying sections 2036(a)(2), 2038(a)(1), and 2703(a)(1) and (2). The estate seeks summary judgment that sections 2036, 2038, and 2703 are inapplicable; it looks for support for its position in section 1.61-22, Income Tax Regs.

I. Statutory and Regulatory Background

A. Summary Judgment Standard

The Court may grant summary judgment when there is no genuine dispute as to any material fact and a decision may be rendered as a matter of law. Rule 121(b); Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), aff'd, 17 F.3d 965 (7th Cir. 1994). The moving party bears the burden of showing that there is no genuine dispute of material fact. Sundstrand Corp. v. Commissioner, 98 T.C. at 520. In deciding whether to grant summary judgment, we view the factual materials and inferences drawn from them in the light most favorable to the nonmoving party. Id.

**[*10]** B.  <u>Statutory Framework</u>

Section 2001(a) imposes a Federal estate tax on the transfer of a decedent's taxable estate.  The taxable estate consists of the value of the gross estate after applicable deductions.  Sec. 2051.  The value of a decedent's gross estate generally includes the fair market value of the property owned by the decedent on the date of death or included in the decedent's gross estate under the Code.  <u>See</u> secs. 2031(a), 2033, 2036, 2038; sec. 20.2031-1(b), Estate Tax Regs.

In general, section 2036 includes property in a decedent's gross estate if: (1) the decedent made an inter vivos transfer of property; (2) the decedent's transfer was not a bona fide sale for adequate and full consideration; and (3) the decedent kept an interest or right in the transferred property of the kind listed in section 2036(a) (i.e., possession of, or the right to receive income from, the transferred property; or the right, "either alone or in conjunction with any person", to designate the persons who shall possess or enjoy the property or income from the property) which the decedent did not give up before death.  <u>E.g.</u>, <u>Estate of Bongard v. Commissioner</u>, 124 T.C. 95, 112 (2005); <u>Estate of Hurford v. Commissioner</u>, T.C. Memo. 2008-278.

In general, section 2038 includes transferred property in a decedent's gross estate if:  (1) the decedent made an inter vivos transfer of property; (2) the

**[\*11]** decedent's transfer was not a bona fide sale for adequate and full consideration; and (3) the decedent kept an interest or right in the transferred property of the kind listed in section 2038(a) (i.e., a power, exercisable by the decedent alone or "in conjunction with any other person", to alter, amend, revoke, or terminate the transferee's enjoyment of the transferred property) which the decedent did not give up before death or which was relinquished within the three-year period ending on the date of death.  E.g., Estate of Hurford v. Commissioner, T.C. Memo. 2008-278.

Section 2703 requires that certain rights and restrictions be disregarded for purposes of Subtitle B (Estate and Gift Taxes).  We provide the full text for the reader's convenience:

> SEC. 2703.  CERTAIN RIGHTS AND RESTRICTIONS DISREGARDED.
>
> (a) General Rule.--For purposes of this subtitle, the value of any property shall be determined without regard to--
>
> > (1) any option, agreement, or other right to acquire or use the property at a price less than the fair market value of the property (without regard to such option, agreement, or right), or
>
> > (2) any restriction on the right to sell or use such property.

**[*12]**        (b) Exceptions.--Subsection (a) shall not apply to any option, agreement, right, or restriction which meets each of the following requirements:

        (1) It is a bona fide business arrangement.

        (2) It is not a device to transfer such property to members of the decedent's family for less than full and adequate consideration in money or money's worth.

        (3) Its terms are comparable to similar arrangements entered into by persons in an arms' length transaction.

C.  <u>Section 1.61-22, Income Tax Regs.</u>

Section 1.61-22, Income Tax Regs., provides rules for split-dollar life insurance arrangements for purposes of the income, gift, employment, and self-employment taxes. In general, under section 1.61-22(b)(1), Income Tax Regs., a split-dollar life insurance arrangement is any arrangement between an owner and a nonowner of a life insurance contract, where either party pays any portion of the premiums (including payment by means of a loan secured by the life insurance contract) and at least one of the parties is entitled to recover, either conditionally or unconditionally, all or any portion of those premiums (and recovery is to be made from or secured by proceeds from the life insurance contract). The parties have not disputed that the agreements at issue represent split-dollar life insurance arrangements within the meaning of this regulation.

**[*13]** Section 1.61-22, Income Tax Regs., provides two mutually exclusive regimes for taxing split-dollar life insurance arrangements entered into (or materially modified) after September 17, 2003:  the economic benefit regime and the loan regime.  Estate of Morrissette v. Commissioner, 146 T.C. 171, 178-179 (2016); see also sec. 1.7872-15, Income Tax Regs. (providing the rules for the loan regime).  The determination of which regime applies depends on which party owns, or is deemed to own, the life insurance policy subject to the arrangement.  Estate of Morrissette v. Commissioner, 146 T.C. at 178-179; sec. 1.61-22(b)(3), Income Tax Regs.

Generally, the regulations treat the person named as the legal owner in the insurance contract as the contract's owner.  Sec. 1.61-22(c)(1), Income Tax Regs.  A nonowner is any person other than the owner who has any direct or indirect interest in the contract.  Id. subpara. (2).  Under this general rule, MB Trust would be considered the owner of the policies, and the loan regime would apply.  Id. para. (b)(3)(i).  As an exception, however, section 1.61-22(c)(1)(ii), Income Tax Regs., provides a special ownership rule:  if the only economic benefit provided to the donee (MB Trust, in this case) under the split-dollar life insurance arrangement is current life insurance protection, then the donor (decedent, in this case) will be deemed the owner of the life insurance contract, irrespective of formal policy

[*14] ownership, and the economic benefit regime will apply. Id. paras. (b)(3)(ii)(B), (c)(1)(ii)(A)(2). In general, the economic benefit regime treats the cost of current life insurance protection as a transfer each year from the donor/owner to the donee/nonowner. Id. para. (d)(1) and (2).

II. Sections 2036(a)(2) and 2038(a)(1)

The $10 million decedent paid to the insurance companies for the benefit of MB Trust was accounted for in three parts as of decedent's date of death. Part was paid to the insurance companies as commissions, fees, etc. Part was used while decedent was alive to pay the cost of current life insurance protection on the insured parties.[6] The remaining part is attributable to the cash surrender value remaining in the policies as of decedent's date of death (i.e., the remaining investment component of the life insurance policies plus appreciation). The parties' disagreement with respect to sections 2036 and 2038 generally concerns the third part.

The estate asks for summary judgment that sections 2036(a)(2) and 2038(a)(1) do not apply to include the cash surrender value in the gross estate because decedent retained no rights with respect to the amounts transferred sufficient to justify application of those sections. On the undisputed facts

---

[6]This amount was treated as a gift under sec. 1.61-22, Income Tax Regs.

[*15] presently before us, however, the rights to terminate and recover at least the cash surrender value were clearly rights, held in conjunction with another person (MB Trust), both to designate the persons who would possess or enjoy the transferred property under section 2036(a)(2) and to alter, amend, revoke, or terminate the transfer under section 2038(a)(1). Cf. Estate of Powell v. Commissioner, 148 T.C. ___, ___ (slip op. at 16) (May 18, 2017) ("[D]ecedent's ability to dissolve * * * [her limited partnership] with the cooperation of her sons constituted a 'right * * * in conjunction with * * * [others], to designate the persons who shall possess or enjoy the property [she transferred to the partnership] or the income therefrom', within the meaning of section 2036(a)(2)." (citing Estate of Strangi v. Commissioner, T.C. Memo. 2003-145, aff'd, 417 F.3d 468 (5th Cir. 2005))).

The estate argues that decedent had no such right because he held the right to terminate only in conjunction with MB Trust, and MB Trust could therefore prevent decedent from terminating the split-dollar agreements. But if the estate were correct, then the words "in conjunction with any person" in section 2036(a)(2), and "in conjunction with any other person" in section 2038(a)(1), would have no force or meaning. The estate also seems to suggest that, in order for section 2036(a)(2) to apply, decedent would have had to be in complete control

[*16] of MB Trust. But the statute by its terms does not require unilateral control, nor are we aware of any caselaw or other authority to support that position.[7] For these reasons, we will deny summary judgment with respect to these issues.

As noted, sections 2036(a) and 2038(a)(1) each except from their application a transfer that is a "bona fide sale for an adequate and full consideration in money or money's worth." Relying upon this exception, the estate contends that neither section 2036 nor 2038 applies because decedent's transfer of $10 million was part of a bona fide sale for adequate and full consideration. Respondent answers that the undisputed facts strongly suggest that decedent's son Patrick stood on both sides of the transactions in question and that the arrangements were therefore not bona fide sales resulting from arm's-length transactions. Respondent also argues that there is a genuine issue of material fact with respect to "whether what MB Trust gave (if anything) in return constituted adequate and full consideration".[8]

---

[7]The estate also suggests that the termination rights were not "ascertainable and legally enforceable power[s]". But we do not see how that could be so. Neither party contends that the split-dollar agreements were not legally enforceable, and both parties agree that the termination rights were part of the agreements.

[8]See supra note 2.

**[*17]** A.  Bona Fide Sale

Whether a transfer was a bona fide sale is a question of business purpose; i.e., did decedent have a legitimate and significant nontax reason, established by the record, for transferring the $10 million?  See, e.g., Estate of Hurford v. Commissioner, T.C. Memo. 2008-278.  The estate (Patrick Cahill, executor), alleges that decedent entered into these split-dollar arrangements because, in the view of decedent's trustee and attorney-in-fact (Patrick Cahill), decedent would have wanted, had he been able to manage his affairs, to ensure sufficient liquidity decades from now when the insured parties (Patrick Cahill and his spouse) die, so as to smooth the transfer of a business (apparently to be owned by Patrick Cahill) to decedent's grandchildren (Patrick Cahill's children).

There are many unresolved factual questions with respect to whether this transfer had a legitimate business purpose.  For instance:  (1) Were these arrangements actually intended to provide liquidity decades from now, or were they intended merely to eliminate the cash surrender value from decedent's estate? (2) The guaranteed return (3%) on the investment in the policies appears to be lower than the interest rate on the loan decedent used to purchase the policies (one month LIBOR plus 1.14%); taking into account all of the economic facts and circumstances, would this arrangement actually be capable of providing liquidity

[*18] decades from now? How much liquidity, in present valued terms (i.e. valued to the date of execution)? At what cost, in present valued terms? And (3) why was an arrangement intended to provide liquidity potentially decades from now funded with a loan that required a balloon payment of the entire principal amount after only five years? That is, if decedent was acting as a prudent business person, why did he fund a long-term obligation with a short-term loan? Because such questions remain, summary judgment is inappropriate with respect to whether decedent's transfer of $10 million was part of a bona fide sale.

B. Adequate and Full Consideration

Whether a transfer was for adequate and full consideration is a question of value; i.e., did what decedent transferred roughly equal the value of what he received in return? See, e.g., Estate of Hurford v. Commissioner, T.C. Memo. 2008-278. On the basis of the undisputed facts presently before us, we conclude that it was not.

According to the estate, at decedent's date of death MB Trust's ability to veto decedent's termination of the agreements rendered the termination rights valueless. Additionally, the estate alleges that decedent's death benefit rights are worth less than 2% of the cash surrender value (i.e., $183,700 ÷ $9,611,624 < 2%). But MB Trust's veto power existed from the moment decedent entered into

**[*19]** these split-dollar agreements, and nothing in the undisputed facts presently before us suggests that the terms of the split-dollar agreements were altered between execution of the agreements and decedent's date of death; consequently, this alleged 98% discount must have been present from the execution of these agreements. Therefore, according to the estate's valuation theory, the initial transfer of $10 million in value cannot have been in exchange for property worth that amount; i.e., under the estate's argument, what decedent received was necessarily worth at least 98% less than what he transferred (even without taking into account the amounts used to pay commissions and fees to the insurance company). Consequently, at least according to the estate's valuation theory, the value of what decedent received (allegedly, something close to $183,700) was not even roughly equal to the $10 million decedent paid.

The estate cites various cases, such as Estate of D'Ambrosio v. Commissioner, 101 F.3d 309 (3d Cir. 1996), rev'g 105 T.C. 252 (1995), as support for its argument that decedent received adequate and full consideration. But these cases only support the conclusion that, where property was transferred in exchange for cash or property with a fair market value equal to the transferred property, the adequate and full consideration requirement was met. In Estate of D'Ambrosio, for example, the parties had stipulated that the remainder interest at issue had been

- 20 -

[*20] sold for its fair market value. See also Wheeler v. United States, 116 F.3d 749 (5th Cir. 1997) (similar). By contrast, in this case the estate argues there was adequate and full consideration where the decedent transferred $10 million and received property worth at least 98% less in return.[9]

C.  Conclusion With Respect to Sections 2036 and 2038

As described, the requirements of sections 2036(a)(2) and 2038(a)(1) are met. The bona fide sale for adequate and full consideration exception is not satisfied because the value of what decedent received was not even close to the value of what decedent paid. Therefore, on the basis of the undisputed facts, we conclude that the estate is not entitled to summary judgment that sections 2036 and 2038 are inapplicable.

IV.  Section 2703

Respondent contends--as an alternative theory to his arguments under sections 2036 and 2038--that MB Trust's ability to veto termination of the split-dollar agreements should be disregarded under section 2703(a)(1) or (2) for purposes of valuing decedent's rights in the split-dollar agreements. The estate

---

[9]The estate also contends that secs. 2036 and 2038 do not apply because the discrepancy between what decedent paid ($10 million) and what decedent received in return (something worth roughly $183,700, according to the estate) has been or will be accounted for as gifts. Because the estate makes the same argument with respect to sec. 2703(a), we will address it following our discussion of sec. 2703(a).

**[*21]** asks for summary judgment that section 2703(a) does not apply.[10]  For the reasons discussed below, we conclude that summary judgment for the estate is inappropriate as to this issue.

A.  The Parties' Dispute as to the Property

The parties disagree about how the relevant property interests should be characterized for purposes of valuation.[11]  Respondent contends that section 2703(a) requires that we value the split-dollar agreements as if decedent had been able unilaterally to terminate the agreements as of his date of death.  The estate characterizes respondent's position to be that the policies, rather than decedent's rights under the split-dollar agreements, are the relevant property interests.  The estate suggests that respondent has improperly ignored the split-dollar agreements to focus only on the policies, as if they were owned directly by decedent.

_____

[10]Both parties treat respondent's theory with respect to sec. 2703 as an argument in the alternative to respondent's theories with respect to secs. 2036 and 2038, disregarding any potential interaction between these various Code sections.  Neither party has addressed whether or how the application of these three Code sections should be coordinated or ordered, in cases where more than one might apply.  As best we understand it, respondent asserts that, under each of his alternative theories, the correct value of the split-dollar agreements to be included in decedent's gross estate equals the policies' cash surrender value as of decedent's date of death.  Accordingly, we are not called upon at present to address any issues regarding the proper ordering or interaction of secs. 2036, 2038, and 2703.

[11]See supra note 2.

[*22] Respondent replies that he is not ignoring the split-dollar agreements but is viewing the property interests owned by decedent in the light of all relevant facts and circumstances, including the split-dollar agreements. In respondent's view, because both decedent's and MB Trust's rights are completely determined by the split-dollar agreements, the relevant property interests for purposes of valuation under section 2703(a) are contractual rights to an amount at least equal in value to the cash surrender value, which rights--in respondent's view--were held by decedent through the split-dollar agreements (rather than directly under the policies) and were restricted because the agreements also allowed MB Trust to prevent decedent's immediate access to that amount.

Considering that the parties agree that the relevant property interests for purposes of section 2703(a) are the rights held under the split-dollar agreements, and that the estate has not disputed that decedent did, in fact, own the termination rights and decedent's death benefit rights (these rights were listed among the facts in respondent's response to which the estate specifically agreed in its reply), we conclude that the estate's criticism of respondent's position is ill-founded, and we proceed to consider the parties' other arguments with respect to section 2703.

**[*23]** B. <u>Section 2703(a)(1)</u>

On the basis of the undisputed facts, we conclude that under section 2703(a)(1) the split-dollar agreements, and specifically the provisions that prevent decedent from immediately withdrawing his investment, are agreements to acquire or use property at a price less than fair market value. The estate claims that decedent paid $10 million to the insurance companies for the benefit of MB Trust and in return received certain rights, namely, the termination rights (which the estate claims are worthless) and decedent's death benefit rights (which, according to the estate's valuation theory, are worth less than 2% of the cash surrender value). MB Trust, meanwhile, paid nothing into this arrangement and received MB Trust's death benefit rights. As best we understand the estate's valuation theory, MB Trust's death benefit rights are allegedly worth at least the cash surrender value minus the value of decedent's death benefit rights (i.e., $9,611,624 – (allegedly) $183,700 = $9,427,924). Nothing in the parties' filings suggests that MB Trust ever paid, or was obligated to pay, any interest or other amount to compensate decedent for MB Trust's acquisition and use of this amount.

C. <u>Section 2703(a)(2)</u>

Next, it is clear that under section 2703(a)(2) the split-dollar agreements, and specifically MB Trust's ability to prevent termination, also significantly

[*24] restrict decedent's right to use the termination rights.  The split-dollar agreements, taken as a whole, clearly restrict decedent's right to terminate the agreements and withdraw his investment from these arrangements.

D.  The Estate's Counterarguments With Respect to Section 2703(a)

The estate argues that section 2703(a) was not intended to apply to this sort of property interest.  Citing no relevant authority, the estate contends that section 2703(a) does not apply because these split-dollar agreements are like promissory notes and partnership interests, as to which, according to the estate, section 2703(a) is inapplicable.  We are not persuaded.

The estate's analogy between these split-dollar agreements and promissory notes is without merit.  A note is generally a bargained-for agreement between two parties in which one party lends a sum of money and the other party agrees to repay that sum with interest over a period of time.  On the undisputed facts before us, it seems clear that MB Trust did not bargain for these split-dollar agreements (it provided nothing to fund these arrangements), nor did MB Trust agree to repay with interest the money provided by decedent.

As the estate points out, it is true that the split-dollar agreements required agreement from both parties before termination.  In that sense, the duration of the split-dollar agreements somewhat resembles the term of a note.  But the term of a

**[*25]** bona fide promissory note is a bargained-for part of the economic deal between the parties to the note; the debtor compensates for the term by paying interest to the lender. Nothing in the facts presently before us suggests that MB Trust ever paid anything to compensate decedent for the indeterminate term of these arrangements, which are therefore entirely unlike bona fide notes.

We are also unpersuaded that the split-dollar arrangements are analogous to partnerships. In Estate of Strangi v. Commissioner, 115 T.C. 478, 488-489 (2000), aff'd in part, rev'd on another issue, 293 F.3d 279 (5th Cir. 2002), we held that "Congress did not intend, by the enactment of section 2703, to treat partnership assets as if they were assets of the estate where the legal interest owned by the decedent at the time of death was a limited partnership or corporate interest." In other words, section 2703 generally does not function as a look-through rule for entities which are valid under State law. No State law entity is involved in this case. Estate of Strangi is therefore inapplicable. Moreover, whereas in Estate of Strangi the Commissioner "did not argue separately that the * * * shareholders' agreement should be disregarded * * * under section 2703(a)", Estate of Strangi v. Commissioner, 115 T.C. at 489, in this case respondent is specifically arguing that MB Trust's ability to prevent termination functions, with

[*26] respect to decedent's termination rights, in much the same way a restrictive agreement functions with respect to corporate or partnership interests.

Citing no authority, the estate also contends that section 2703(a) applies only to option or buy-sell agreements. We can see no reason why that would be so; the plain language of section 2703(a) is not so limited.

Citing Holman v. Commissioner, 130 T.C. 170 (2008), aff'd, 601 F.3d 763 (8th Cir. 2010), the estate appears to claim that section 2703(a)(2) applies only to arrangements involving a restraint on alienation. We do not see how Holman-- which held that certain restrictions in a partnership agreement on a limited partner's right to transfer her interest were disregarded under section 2703(a)(2)-- supports this proposition. In any event, section 2703(a)(2) clearly provides that it covers restraints on "use" as well as restraints on sale. It is difficult to see (and the estate has not explained) how MB Trust's ability to veto termination could be viewed as anything other than a restraint on decedent's ability to recover (and therefore use) his investment in these arrangements.

Citing Estate of Elkins v. Commissioner, 140 T.C. 86, 114 (2013), aff'd in part, rev'd in part, 767 F.3d 443 (5th Cir. 2014), the estate also appears to claim that section 2703(a)(2) applies only to arrangements where the property interest (in this case, the termination rights) exists or is created separately from the

**[*27]** restriction (in this case, MB Trust's ability to prevent termination). <u>Elkins</u> held that in valuing undivided fractional interests in certain works of art, the decedent's agreement to waive his right to institute a partition action with respect to some of the works of art was disregarded under section 2703(a)(2). <u>Elkins</u> does not say, and nothing in the statute suggests, that the application of section 2703(a)(2) is limited in the manner that the estate claims.

We note that most of the estate's arguments with respect to section 2703(a) are generally to the effect that, if section 2703(a) applies in this case, it would also apply to all sorts of other options, agreements, rights, and restrictions. For example, the estate argues that "almost every two-party agreement has a restriction that one party cannot just unilaterally terminate the agreement." The estate's implicit claim would appear to be that its hypothetical restriction is so obviously legitimate that Congress could not have meant for section 2703(a) to apply. But section 2703(b) provides the exceptions to application of section 2703(a); in particular, section 2703(b)(3) specifically provides for comparison of the terms of the option, agreement, right, or restriction to "similar arrangements entered into by persons in an arms' length transaction." The estate's vague and general arguments by way of comparison are therefore more appropriate as part of a section

**[\*28]** 2703(b)(3) analysis.  And because the parties have yet to address whether section 2703(b) applies in this case, we decline to consider it.

### E.  Conclusion as to Section 2703(a)

On the basis of the undisputed facts before us, we conclude that the requirements of section 2703(a)(1) and (2) are each met.  The estate's motion for partial summary judgment will therefore be denied with respect to section 2703(a).  The parties have not addressed the section 2703(b) exception to application of section 2703(a), and so we do not consider whether the exception applies in this case.

## V.  The Estate's Counterarguments

### A.  Double Counting Between Gift and Estate Taxes

As we understand the estate's argument (which is difficult to follow), the estate generally suggests that the difference between the $10 million that decedent paid and the approximately $183,700 that he allegedly received in return (for simplicity, the difference) would be accounted for as gifts and that to count the difference as part of the estate under sections 2036, 2038, or 2703 would essentially double count that amount as both a gift and as part of the gross estate.  We are unconvinced.

[*29] First, the undisputed facts show that decedent reported no part of the difference as a gift to MB Trust before his death. Furthermore, the parties agree that nothing other than the cost of current life insurance protection was a gift under section 1.61-22, Income Tax Regs. The cost of current life insurance was deducted from the cash surrender value of each policy. The cash surrender value remaining as of decedent's date of death was therefore composed of funds that had not yet been used to pay the cost of current life insurance. Accordingly, no part of the cash surrender value remaining as of decedent's date of death had been a gift, and counting the difference in the gross estate under section 2036, 2038, or 2703 does not double count any amount.

Although its argument is not entirely clear, the estate seems to suggest that the difference will be accounted for as gifts the estate alleges will be made <u>after decedent's death</u> under section 1.61-22, Income Tax Regs. Again, we are unconvinced. The estate seems to suggest that the split-dollar agreements will continue into the future; that decedent's heirs will inherit decedent's interests in the agreements; and that the cost of current life insurance will continue to be treated as gifts to MB Trust. But even supposing, as the estate would have us believe, that these arrangements will remain in place after this case is finally decided, the gift of current life insurance protection to MB Trust following

**[*30]** decedent's death would not be a gift from decedent but rather from whoever happens to succeed to decedent's interests in the split-dollar agreements. Consequently, the difference will not be accounted for under any application of the gift tax to decedent.

For these reasons, we reject the estate's contention that any part of the difference has been, or will be, accounted for as gifts with respect to decedent.

B.  The Estate's Counterargument With Respect to the Regulations

1.  Relevance of the Regulations

The estate seeks summary judgment that pursuant to section 1.61-22, Income Tax Regs., the economic benefit regime applies to the split-dollar agreements.  Respondent counters that the regulations do not apply for estate tax purposes, observing, "the economic benefit regime [r]ules * * * are gift tax rules, not estate tax rules."

Respondent is correct that these regulations do not apply for purposes of the estate tax and therefore do not apply--at least not directly--to this case.  Section 1.61-22(a), Income Tax Regs., lists the purposes for which it applies; the list does not include the estate tax:

> This section provides rules for the taxation of a split dollar life insurance arrangement for purposes of the income tax, the gift tax, the Federal Insurance Contributions Act (FICA), the Federal

**[*31]** Unemployment Tax Act (FUTA), the Railroad Retirement Tax Act (RRTA), and the Self-Employment Contributions Act of 1954 (SECA).

The economic benefit computation rules are found in paragraphs (d) through (g) of section 1.61-22, Income Tax Regs. These paragraphs explain the gift tax consequences of transfers from the donor/owner (in this case, decedent) to the donee/nonowner (in this case, MB Trust) under a split-dollar arrangement. The estate tax, by contrast, taxes the transfer of a decedent's taxable estate to the decedent's heirs (rather than to a counterparty of the split-dollar arrangement) under a will or by operation of law (rather than under a split-dollar arrangement). Accordingly, transfer of an estate is not among the transfers addressed by section 1.61-22, Income Tax Regs.

It is true, however, that "[t]he gift tax was supplementary to the estate tax. The two are in pari materia and must be construed together", Estate of Sanford v. Commissioner, 308 U.S. 39, 44 (1939), at least insofar as "obvious reasons do not compel divergent treatment", Merrill v. Fahs, 324 U.S. 308, 313 (1945); see also Estate of Magnin v. Commissioner, 184 F.3d 1074, 1078 (9th Cir. 1999), rev'g T.C. Memo. 1996-25. The parties have not disputed that the economic benefit regime applies to these split-dollar agreements for purposes of the gift tax. Consequently, to the extent that (1) the regulations illuminate the gift tax treatment

**[*32]** of transfers arising out of the split-dollar agreements at issue, (2) those transfers are relevant to estate tax issues, and (3) obvious reasons do not compel divergent interpretations of the relevant gift and estate tax Code sections, we shall look to the regulations in deciding this case.

### 2. The Estate's Consistency Arguments

The estate seems to suggest that we should modify the approach required by sections 2036, 2038, and 2703 so as to avoid inconsistency between these statutes and the regulations. We disagree.

First, there is no inconsistency between the estate tax statutes and section 1.61-22, Income Tax Regs. As described, the only amounts treated as gifts were the amounts deducted from the investment in the life insurance contracts to pay for the cost of current life insurance protection. No part of the remainder, i.e., the cash surrender value as of decedent's date of death, has been or will be treated as a gift with respect to decedent. To the extent the cash surrender value might be treated as gifts after decedent's estate is distributed to his heirs, those gifts will not be attributable to decedent, as discussed. Consequently, no part of decedent's original $10 million will be double counted under the gift and estate tax regimes.

Next, the estate points out that section 2512(b) provides that if "property is transferred for less than an adequate and full consideration in money or money's

**[*33]** worth, then the amount by which the value of the property exceeded the value of the consideration shall be deemed a gift".  Flipping this rule on its head, the estate posits that if the amount by which the value of the property transferred exceeded the value of the consideration received is not deemed a gift, then the property was not transferred for less than adequate and full consideration.  The estate's argument, as best we understand it, is that because section 1.61-22, Income Tax Regs., does not deem the difference to be a gift, then the entire $10 million transferred must have been for adequate and full consideration (or full and adequate consideration, depending on whether one is looking at sections 2036 and 2038 or section 2703) pursuant to section 2512.  We disagree.

Section 2512 requires a completed transfer of property (i.e., an economically benefited donee).  Estate of Harper v. Commissioner, T.C. Memo. 2002-121, 83 T.C.M. (CCH) 1641, 1654 (2002) ("[W]hile section 2512(b) describes a gift as a transfer of property 'for less than an adequate and full consideration in money or money's worth', there exists an equally fundamental principle that a gift requires a donee--some other individual must be enriched.").  As noted, decedent applied the economic benefit regime to this transaction for gift tax purposes.  This means that the only economic benefit to MB Trust under these agreements was the cost of current life insurance protection.  See supra p. 13.

[*34] Consequently, MB Trust was not economically benefited by the cash surrender value, which had not yet been used to pay the cost of current life insurance protection.  Therefore, there was no completed gift with respect to the cash surrender value remaining as of decedent's date of death, and section 2512(b) is inapplicable.

As a final note:  Where (as here) the only benefit to the donee is current life insurance protection, the economic benefit regime clearly treats decedent as the owner of the cash surrender value.  See, e.g., sec. 1.61-22(b)(3)(i), (ii)(B), (c)(1)(ii)(A)(2), (d)(2), (4)(ii), Income Tax Regs.  The estate agrees that the benefit of current life insurance protection was treated (in accordance with the regulations) as a gift from decedent to MB Trust out of the cash surrender value.  Consistency between the regulations and the estate tax Code sections would therefore demand that the cash surrender value remaining as of decedent's date of death be valued as part of, or included in, decedent's gross estate.  In short, the consistency the estate demands would seem to require the result respondent

[*35] seeks.[12]  Summary judgment in the estate's favor on this theory is therefore inappropriate.

VI.  <u>Conclusion</u>

For the foregoing reasons, we shall deny the estate's motion for partial summary judgment.  Respondent has not moved for summary judgment in his favor on any of the issues discussed.  As there may be other facts or theories not yet presented, we decline to treat respondent's response to the estate's motion as a cross-motion for partial summary judgment.

In accord with the foregoing,

<u>An appropriate order will be issued denying petitioner's motion for partial summary judgment</u>.

---

[12]The regulations contain a consistency rule, which would appear to suggest the same conclusion.  <u>Cf.</u> sec. 1.61-22(b)(4), Income Tax Regs. ("A split-dollar life insurance arrangement * * * must be treated in the same manner by the owner and the non-owner * * *.  In addition, the owner and non-owner must fully account for all amounts under the arrangement[.]").  It would appear that the estate essentially seeks to treat decedent as the owner for gift tax purposes and MB Trust as the owner for estate tax purposes.